_____

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION
_____

ENOLA RATCLIFFE,

           Plaintiff,

vs.

JO ANNE BARNHART, current
Commissioner of the Social Security
Administration,

           Defendant.

Case No. 2:05-CV-751 TS

**REPORT AND RECOMMENDATION**

Judge Ted Stewart
Magistrate Judge Brooke C. Wells


Before the court is Plaintiff Enola Ratcliffe's appeal of the Commissioner's decision denying Ratcliffe's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).[1] After reviewing the parties' memoranda, the record, which includes the Administrative Law Judge's (ALJ) decision, and relevant case law, the court finds that based upon the record there was sufficient evidence regarding Plaintiff's low IQ to require the ALJ to further investigate this medical condition.[2] Further, Ratcliffe's counsel made a specific request for an IQ evaluation that was not addressed by the ALJ in his decision. An ALJ need not pursue every potential line of questioning or even exhaust all lines of inquiry.[3] But, an ALJ has a duty

_____

[1] *See* 42 U.S.C. §§ 405(g) and 1383(c)(3), which provide for judicial review of the Commissioner's final decision.
[2] *See* *Hawkins v. Chater*, 113 F.3d 1162, 1169 (10th Cir. 1997) (holding that the claimant "presented sufficient medical evidence to warrant further investigation of her physical condition").
[3] *See id.* at 1168.

to fully develop the record.[4]  And, in this case Ratcliffe's counsel's request, along with the evidence in the record, imposed a duty on the ALJ to order an examination concerning Ratcliffe's IQ.  Accordingly, the court recommends that this case be remanded to the ALJ for further proceedings.

## I. PROCEDURAL HISTORY

Ratcliffe applied for DIB and SSI in May 2002.[5]  Ratcliffe claimed she became disabled on November 15, 2001, due to psychological problems and an inability to concentrate.[6]  Ratcliffe's claim was denied initially[7] and upon reconsideration.[8]  A hearing was held before ALJ Robin Henrie on September 2, 2004.  Following the hearing, the ALJ issued a decision on November 17, 2004, finding that Plaintiff was not disabled within the meaning of the Act.[9]  Ratcliffe's request for review was denied by the Appeals Council and the ALJ's decision became the final decision of the Commissioner.[10]

## II. BACKGROUND[11]

Plaintiff was 32 years old on the alleged date she became disabled, and was 35 years old

---

[4] *See Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).
[5] Tr. 103-106. Tr. refers to the administrative record filed with the court.
[6] *Id.* at 103, 141.
[7] *Id.* at 86-88.
[8] *Id.* at 80-82.
[9] *Id.* at 13-26.
[10] *Id.* at 4-5.
[11] Most of the factual background is taken directly from the parties' briefs and the administrative record.  There is no dispute regarding the facts behind Plaintiff's action so the court finds it unnecessary and unproductive to restate the facts in a substantially different manner than that presented by the parties.

on the date of the ALJ's decision denying benefits.[12]  Ratcliffe has a high school education and

has worked in the past as a day care worker, airline ramp agent, cashier, shipping clerk, janitor,

and security guard at the airport.[13]  Ratcliffe claims she is "disabled due to severe mental

impairments including Major Depression, anxiety disorder, and attention deficit disorder."[14]

Ratcliffe does not have health insurance and therefore, "the evidence in this case is from

consulting or examining physicians, none of who[m] even treated Ms. Ratcliffe."[15]

## A.  <u>Medical Evidence</u>

On May 14, 2002, Fares Arguello, M.D., examined Plaintiff for complaints of depression.

Her chief complaint when asked was "I've seen the ad on depression."  Plaintiff reported she had

been "markedly sad" since October 2000, when her mother died of cancer, and that the sadness

had become much worse in the previous 18 months.  Plaintiff stated that she experienced

depression at the age of 17 but after undergoing psychotherapy for a year her depression cleared.

Plaintiff described herself as having depression four out of seven days.  She had been on Prozac

since March 2002.  Plaintiff reported difficulty in concentrating and conversing with others and

---

[12] *Id.* at 103.
[13] *Id.* at 147, 150-57
[14] Pla.'s brief p. 3.
[15] *Id.*

complained of irritability, indigestion, headaches, increased perspiration, and increased urination.[16]   And, at times said she "feels separated from her body."[17]

      For the mental status examination Plaintiff was appropriately attired and well groomed. She was fully oriented, displayed no unusual movements or bizarre behaviors, and did not appear anxious or expansive.  Plaintiff's affect showed a slight decrease in animation and she looked depressed.  There was no evidence of a thought disorder, no hallucinations or delusions, and she did not have suicidal or homicidal ideation.  Her insight and judgement were appropriate with her memory being intact.  Dr. Arguello noted that Plaintiff "seemed to have good intelligence." Dr. Arguello diagnosed major depression, recurrent, moderate, and assigned a Global Assessment of Functioning (GAF)[18] of 51 to 55.[19]   Dr. Arguello provided Plaintiff an opportunity to participate in a Prozac drug study.[20]

      On October 21, 2002, Louis F. Morse, Ph.D., performed a consultative examination of Plaintiff in connection with her application for benefits.  Plaintiff reported that her last full-time job was as a housekeeper in November 2000, and that she quit her job because her wage was

---

[16] Tr. 166.
[17] *Id.*
[18] The Global Assesment of Functioning, or GAF, scale is a hypothetical numeric scale from 1 to 100 used by mental health professionals to rate psychological, social and occupational functioning.  The scores range from a high of 91-100 which indicates superior functioning, to a low of 1-10 which indicates a persistent danger of either hurting oneself or others.  For more information see the *Diagnostic and Statistical Manual of Mental Disorders.*
[19] A GAF score between 51 and 60 is indicative of "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. rev.) *DSM-IV-TR*, p. 34.
[20] Tr. 167.

decreased while her work was increased.  She said she was not looking for work and reported she had pain in her arm and got confused by detail.[21]

She also reported having problems with bruising easily, a racing mind, insomnia, and migraine headaches.  Plaintiff reported a history of treatment for depression in 1985 and 1999.  She stated she participated in a pharmaceutical research study for her depression for six weeks, but the medication she was provided did not help her.  Plaintiff noted she was currently taking Paxil and obtained her medication by getting samples.  Plaintiff stated that she graduated from high school, but had attended special education classes.  She complained she had difficulty remembering, was easily distracted, and did not like to be around too many people.  She also reported a history of alcohol, drug use, and had been high in the past but had not used drugs in two years.  Plaintiff indicated she spent her days watching television, listening to the radio, sitting outside, and helping occasionally with household chores, as well as going for walks once or twice a week.[22]

On examination, Plaintiff had good hygiene, was alert, fully cooperative, and answered the interview questions without any resistance or reservation.  She was friendly, courteous, smiled, laughed, made good eye contact, and had normal gait and posture.  She reported that she could read, write, and use the phone book, and that she had a driver's license, but did not drive because it made her nervous.  She reported having a memory problem but during the

---

[21] *Id.* at 173.
[22] *Id.* at 174.

examination there were no observable significant memory lapses.  Plaintiff was fully oriented

and displayed no signs of a thought disorder.  Her articulation was clear and she had normal

expressive and receptive language skills.[23]  Although she had thought about suicide, Plaintiff

denied having suicidal ideation.  Dr. Morse estimated that Plaintiff had low average general

intellectual functioning.  Dr. Morse assessed a history of mood disturbance, and attributed the

absence of signs of significant mood disturbance in his office to effective medical treatment.[24]

In conclusion, Dr. Morse reported that Plaintiff demonstrated the ability to focus, concentrate,

understand, follow simple instructions, and had normal social skills during the examination.[25]

On October 31, 2002, M. Egan, M.D., a State agency psychiatrist who reviewed the

medical evidence, found that Plaintiff's affective disorder and anxiety disorder resulted in mild

restriction of activities of daily living, moderate difficulties in maintaining social functioning,

and mild difficulties in maintaining concentration, persistence, and pace.[26]  Dr. Egan noted that

there was insufficient evidence from 11/15/01 to 5/13/02 to determine if Plaintiff experienced

episodes of decompensation.  Dr. Egan opined that Plainitff suffered from major depression and

anxiety disorder.[27]  In rating Plaintiff's functional limitations, Dr. Egan gave Plaintiff moderate

---

[23] *Id.* at 175-76.
[24] *Id.* at 176-77.
[25] *Id.* at 177.
[26] *Id.* at 191-203.
[27] *Id.* at 194-96.

limitations in social functioning, mild limitations in daily living, and mild limitations in maintaining concentration, persistence or pace.[28]

On April 12, 2003, Blair F. McGirk, M.D., performed a consultative examination of Plaintiff.  Plaintiff presented with the following complaints: right elbow spasms, swelling and soreness, arthritis in her knees, a pinched nerve in her back, headaches, depression, and anxiety.[29]  Ratcliffe reported that she had injured herself several times while participating in gymnastics.  She experienced knee and back pain with sitting for more than 20 minutes at a time or walking more than a half an hour at a time.  Plaintiff said she had to continually alternate between sitting, standing, and walking.  Plaintiff reported she also had numbness and pain in her foot and spasms in her back and calves, and that she had to sleep on her side because she could not sleep on her back.[30]  She noted that she also experienced a head injury and that, since then, she got headaches in hot temperatures, or when she ate cheese.  She stated that she had depression and anxiety, but had not received any treatment for that in years because she could not afford the medications.  She had trying to get into the Valley Mental Health clinic for a year but was unsuccessful.[31]

On examination, Plaintiff was alert, fully oriented, friendly, cheerful, and cooperative, and had appropriate speech and affect.  She cried while discussing her depression and she shifted while seated.  Plaintiff had normal range of motion in her neck, back, and extremities; full

---

[28] *Id.* at 201.
[29] *Id.* at 178.
[30] *Id.*
[31] *Id.* at 179.

strength; intact sensation; good bilateral finger dexterity; negative straight leg raising tests; a normal gait and station; no joint abnormalities; and no back tenderness.  She had difficulty squatting because of pain, and her right anconeus muscle region was tender to palpation, consistent with tennis elbow.  Dr. McGirk diagnosed right tennis elbow and history of depression and noted Plaintiff shifted constantly in her chair.  Dr. McGirk did not assess any physical restrictions or limitations on her ability to perform work activity.[32]

On April 21, 2003, William P. Kuentzel, M.D., performed an examination of Plaintiff. When Dr. Kuentzel asked Plaintiff what her disability was, she replied, "we're going for mental" which she explained referred to "anxiety, stress, and I'm not sure what else."[33]  Plaintiff reported she had "lots and lots" of headaches, poor sleep, crying spells, inability to concentrate, anhedonia, and chronic suicidal ideation, and she noted she had these depressive symptoms for as long as she could remember.  She stated she had been in special education classes in school, and Dr. Kuentzel thought Plaintiff appeared to have symptoms of attention deficit hyperactivity disorder.  Plaintiff additionally complained that she had been hearing voices "all the time" for the previous year and a half.  She noted that she lived with her niece and niece's 10 month old son.[34] Plaintiff indicated that the last treatment she received was three years previously, when she lived in Nevada.  Plaintiff said she had poor concentration ever since grade school and had difficulty

---

[32] *Id.* at 180.
[33] *Id.* at 182.
[34] *Id*.

processing information and staying on and completing tasks.[35]  She complained of a five year

history of panic attacks occurring one to two times a day, a dislike of being around other people,

a short temper, being impulsive, having episodes when she loses awareness, problems with her

knees, and right elbow, headaches, and poor eyesight.[36]  Plaintiff reported her niece or niece's

son helped her get up and going for the day, but she indicated she spent most of the day staying

alone in her room.[37]

 The mental status examination revealed Plaintiff was well groomed, cooperative, and

reasonably forthcoming.  Plaintiff appeared markedly anxious and depressed and she was

"constantly fidgety" throughout the entire interview.  Plaintiff's affect was blunted and almost

flat and she cried several times during the interview.  Dr. Kuentzel found no evidence of a

thought disorder and diagnosed Ratcliffe with attention deficit hyperactivity disorder, major

depression with recent onset of psychotic features, unresolved grief, panic disorder, and a

possible learning disorder with a questionable IQ.[38]  Dr. Kuentzel expressed concern about a

possible seizure disorder based on Ratcliffe's headaches, apparent lapses of consciousness, and

her niece's description of Ratcliffe's eyes going to one side when losing consciousness.[39]  He

assigned her a GAF score of 34.[40]

---

[35] *Id.* at 183.
[36] *Id.* at 183-84.
[37] *Id.* at 184-85.
[38] *Id.* at 185.
[39] *Id.* at 186.
[40] A GAF score between 31 and 40 is indicative of "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."

A state agency psychologist who reviewed the medical evidence in May 2003, found that Plaintiff's organic mental disorder and affective disorder resulted in moderate restriction in the activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, and pace.  There was insufficient evidence to determine if Plaintiff experienced episodes of decompensation.[41]  A mental residual functional capacity assessment indicated Plaintiff had moderate limitations in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace with an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them; and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.[42]

---

*Diagnostic and Statistical Manual of Mental Disorders* (4th ed. rev.) *DSM-IV-TR*, p. 34.
[41] Tr. 209-22.
[42] *Id.* at 205-07.

**B.  Statements From Ratcliffe's Friends**

There are several statements in the record from individuals-Ratcliffe's roommate, and friends that have known her anywhere from a relatively short time, four months, to some that have known her for fifteen years-describing Ratcliffe's impairments.  These statements generally indicate that Ratcliffe has good days and bad days with some days being so bad that she cannot get out of bed.[43]  Ratcliffe's mood can change at the "drop of a hat" from "fun, bright and outgoing" to "sullen, angry, depressed or over anxious."[44]  Also noted are uncontrolled outbursts of crying that result in Ratcliffe becoming disoriented.[45]  She "flies off the handle for no reason and has extreme anxiety attacks when she used to be calm and friendly."[46]  Occasionally, these mood changes result in her fighting those who are trying to help her.[47]  Allegedly, Ratcliffe hears sounds and has hallucinations from time to time.[48]

**C.  Ratcliffe's Testimony**

During the hearing Ratcliffe testified that she last worked as a baggage sorter for Delta airlines.[49]  She had the job for just three weeks, however, before she left to take care of her ailing mother who died.[50]  Since her mother died Ratcliffe did not have a desire to work.  Ratcliffe stated "Since my mom died, I just can't [work] I don't have no one there to support.  I just feel

---

[43] *Id.* at 158.
[44] *Id.* at 159.
[45] *Id.* at 129.
[46] *Id.* at 123.
[47] *Id.* at 159.
[48] *Id.* at 158.
[49] *Id.* at 36.
[50] *Id.*

like when my mom was there it was my net and I didn't have to worry or think about what I could or I couldn't do, because I knew my mom was always there.  And now she's not.  It's hard."[51]

Plaintiff testified about living in Reno, Nevada with a friend and her friend's mother for about a year.[52]  While living in Reno Ratcliffe often accompanied her friend's mom to the thrift store that she owned.  Ratcliffe would visit with customers, wander around the store, and examine the merchandise looking for "neat things."[53]  Occasionally Ratcliffe would help out with the housework.   After her friend's mother sold the thrift store Ratcliffe moved back to Utah.

Since moving back to Utah, Ratcliffe has lived with friends and a friend's niece.[54] Plaintiff noted that she helped out around the house by doing some housework and cleaning. Plaintiff testified that she did not go out very often including trips in the car because she gets scared thinking she is getting in an accident.[55]  She is always jerking and is a distraction to whoever is driving.  Ratcliffe also experiences a fear of crowds and people.  She only shops at 1:00 or 2:00 a.m. to avoid crowds and often spends most of the day alone just thinking.[56]

---

[51] *Id.* at 37.
[52] *Id.* at 39-40.
[53] *Id.* at 41.
[54] *Id.* at 44-46.
[55] *Id.* at 46.
[56] *Id.* at 47, 180.

Ratcliffe testified that she has difficulty staying on task, remembering things, and concentrating.[57]  She was able to read some simple sentences given to her by the ALJ, had to use a calculator to add and subtract, and displayed difficulty when reading large numbers.[58]  Plaintiff acknowledged a history of illicit drug use but indicated that she had not used drugs in several years.[59]  She has not lived by herself.  Finally, Plaintiff's attorney asked to have the record held open to submit additional medical records and asked the ALJ to order a psychological examination to evaluate her IQ.[60]

**D.  Vocational Expert's Testimony**

Jack Hurst, a vocational expert (VE), also testified before the ALJ.  He reviewed the exhibits relating to Ratcliffe's past work and heard Plaintiff's testimony.[61]  The VE testified that Plaintiff's past relevant work was in the unskilled to semi-skilled range.[62]  The ALJ asked the VE to consider the following hypothetical with an individual of Plaintiff's age, education, and experience who:

> could not work around crowds.  Also the jobs must be in the lower stress levels of work, which . . . is a low production rate work type situation, essentially no working with the general public, minimal supervision, and minimal interaction with supervisors and coworkers, and minimal work setting changes.  Concentration levels would have to be low.  She could be alert and attentive to most unskilled tasks, but could not do concentrated tasks, like mental computations or sustained spontaneous speaking or sustained reading and writing.  The jobs would have to be in the lower memory levels of

---

[57] *Id.* at 50.
[58] *Id.* at 51.
[59] *Id.* at 54-55.
[60] *Id.* at 34-35.
[61] *Id.* at 62-63.
[62] *Id.* at 64.

> work with the ability to understand, remember, and carry out simple one to two-step instructions with the option to use memory aids and have only minimal changes in the work instructions from week to week. [and] a sit/stand option. . . .  Other than that, it would be a full range of light or sedentary exertionally and unexertionally.[63]

Mr. Hurst opined that such an individual could work as a small parts assembler, medical assembler, semiconductor bonder, or clerical addresser.  When asked if his responses were consistent with the official descriptions of these positions found within the *Dictionary of Occupational Titles*, Mr. Hurst stated yes, but for the sit/stand option that Ratcliffe needed.  This however, was not a problem in Mr. Hurst's view because he reduced the availability of these positions based upon the hypothetical and upon the aggregation of Plaintiff's moderate limitations related to unskilled labor.[64]

## E. **The ALJ's Decision**

At step one the ALJ determined that Plaintiff had not performed substantial gainful activity since her alleged onset of disability date.[65]  At step two, the ALJ found that Plaintiff's affective/mood disorder, organic mental disorder, anxiety related disorder, and right tennis elbow were severe impairments.[66]  For step three the ALJ determined that Plaintiff's impairments, alone or in combination, did not meet or equal the requirements of any impairment in the listings.  This included "Listings 12.02 (organic mental disorders), 12.04 (affective disorders) and 12.06

---

[63] *Id.* at 64-65.
[64] *Id.* at 68-70.
[65] *Id.* at 17.
[66] *Id.*

14

(anxiety-related disorders)."[67]   At step four the ALJ concluded that Ratcliffe could not perform any past relevant work.[68]   In doing so the ALJ undertook a determination of Ratcliffe's Residual Functional Capacity.

Although Ratcliffe could not perform her past work, based on the record and the testimony before the ALJ, the ALJ found that Ratcliffe could perform light unskilled work that did not require sitting, standing, and walking more than 15-20 minutes at a time; climbing stairs; working in other than a clean, climate controlled environment; work at more than a low stress level meaning a low production rate, no working with the general public, minimal supervision, minimal interaction with supervisors and co-workers, and minimal work setting changes; work at more than a low concentration level which precluded tasks such as mental computation, sustained spontaneous speaking, and sustained reading and writing, but still having average alertness and attentiveness; and work at more than a low memory level, meaning the ability to understand, remember, and carry out simple one and two step instruction, the option to use memory aids, and with only minimal changes in the work instructions from week to week The ALJ further found that Plaintiff could not perform work involving fine vision, night vision, working with crowds, and distractions and disturbances, and could not perform work involving exposure to cheese.[69]

---

[67] *Id.* at 18.
[68] *Id.* at 23.
[69] *Id.* at 22-23.

Finally at step five, based upon the testimony of a VE, Ratcliffe's residual functional capacity, and the record, the ALJ found that Plaintiff could perform work existing in significant numbers in the national economy, to wit, employment as an Addressor, Semi-Conductor Bonder, Small Parts Assembler, or Medical Assembler.[70]  Based on the foregoing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act.[71]

In reaching his decision, the ALJ rejected the opinion of Dr. William Keuntzel.  Dr. Keuntzel opined that Ratcliffe had a GAF of 34 with the onset of psychotic features.  The ALJ states "[Dr. Keuntzel's] opinion is quite conclusory, providing very little explanation of the evidence relied on in forming that opinion and he apparently relied heavily on the subjective report of symptoms and limitations provided by the claimant."[72]  The ALJ goes on to cite the contradictory evidence in the record by Dr. Arguello and Dr. Morse in concluding the "great weight of the evidence does not lend credence to a GAF of only 34."[73]

The ALJ also "carefully considered the witness statements"[74] submitted by Ratcliffe's friends.  Ultimately, however, the ALJ gave them little weight because they "are subjective and not based on objective clinical and laboratory findings, and are not in accord with the great weight of the evidence."[75]

---

[70] *Id.* at 24.
[71] *Id.*
[72] *Id.* at 22.
[73] *Id.*
[74] *Id.*
[75] *Id.*

Finally, the ALJ discounted Ratcliffe's subjective complaints and testimony based on inconsistencies in the record and within Plaintiff's own testimony.[76]

### III. STANDARD OF REVIEW

Review of the Commissioner's decision is limited to determining whether substantial evidence in the record as a whole supports the factual findings, and whether the correct legal standards were applied.[77]  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[78]  Evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.[79]  The court may neither re-weigh the evidence nor substitute its discretion for that of the Commissioner,[80] and where the evidence as a whole can support either the agency's decision or an award of benefits, the agency's decision must be affirmed.[81]  Finally, "'[f]ailure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal.'"[82]

Ratcliffe argues that "[b]ecause the questions presented in this case only concern the question of whether the ALJ applied the correct legal standards in determining disability, the

---

[76] *Id.*

[77] See *Castellano v. Secretary of Health & Human Services,* 26 F.3d 1027, 1028 (10th Cir. 1992)*; Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1497-98 (10 Cir. 1992); 42 U.S.C. § 405(g); *Richardson v. Perales,* 402 U. S. 389, 402 (1981).

[78] *Hamilton,* 961 F.2d at 1498

[79] See *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992).

[80] See *Hinkle v. Apfel,* 132 F.3d 1349, 1351 (10th Cir. 1997); *Kelly v. Chater,* 62 F.3d 335, 337 (10th Cir. 1995)

[81] See *Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir. 1990).

[82] *Byron v. Heckler,* 742 F.2d 1232, 1235 (10th Cir. 1984) (quoting *Smith v. Heckler,* 707 F.2d 1284, 1285 (11th Cir. 1983).

substantial evidence rule does not apply."[83]  Therefore, according to Ratcliffe, "[t]he only standard of review to be applied is a determination of whether the ALJ applied the correct legal standards or made the correct legal conclusions based on his factual findings."[84]  The court is not persuaded by Ratcliffe's position.

Instead, the court finds that it must consider the substantial evidence rule for the following reasons.  First, Ratcliffe's own arguments undermine her position.  Ratcliffe alleges errors were made based on the weight of the evidence in the record.  Additionally, in her brief Ratcliffe further states that the standard of review in this case includes a determination of "whether the ALJ's factual findings are supported by substantial evidence."[85]  Next, the ALJ rejected the opinion of one of Ratcliffe's physicians.  Thus, the court must determine if there was substantial evidence to support the ALJ's decision to reject this opinion.  And finally in opposition, the Government argues that this court should affirm the decision of the Commissioner because it was "free of legal error and reached upon the basis of substantial evidence."[86]  Thus, the court finds it appropriate to not only consider whether appropriate legal standards were applied but whether there is "such relevant evidence as a reasonable mind might accept as adequate to support [the ALJ's] conclusion[s]."[87]

---

[83] Pla.'s brief p. 3.

[84] *Id.*

[85] *Id.* at 2.

[86] Op. p. 20.  The court notes that Ratcliffe never responded to this position in a reply brief.  But, even if Ratcliffe had done so, it would have likely been unpersuasive to the court based upon Ratcliffe's own arguments in her opening brief.

[87] *Fowler v. Bown*, 876 F.2d 1451, 1453 (10th Cir. 1989) (internal quotations omitted).

## IV. DISCUSSION

An applicant for Social Security disability benefits is considered to be disabled for the purposes of the Social Security Act (Act) if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months."[88]  The Act provides

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.[89]

The Commissioner is required to follow a five-step sequential evaluation process to determine whether a claimant is disabled.[90]  Plaintiff bears the burden of establishing a prima facie case of disability at steps one through four.[91]  If a claimant successfully meets this burden, the burden then shifts to the Commissioner at step five to show that the claimant retains sufficient RFC to perform work in the national economy given her age, education, and work

---

[88] 42 U.S.C. § 423(d)(1)(A).
[89] *Id.* at § 423(d)(2)(A)
[90] *See Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988).
[91] *See id.* at 751 & n.2.

experience.[92]   A social security hearing, however, is not like a typical judicial proceeding because it is nonadversarial.[93]   Thus, the ALJ is responsible in every case-regardless of whether or not a claimant is represented by counsel-"to ensure that an adequate record is developed during the disability hearing consistent with the issues raised."[94]   Finally as noted by the Tenth Circuit, "[t]he cases are numerous that hold that the Social Security Act should be liberally construed in favor of disability and the intent is inclusion rather than exclusion."[95]

Plaintiff applied for DIB and SSI in May 2002.  Plaintiff claims she became disabled on November 15, 2001, due to psychological problems and an inability to concentrate.  Ratcliffe was 32 years old when she claims that she became disabled.  At the time of the hearing she was 35 years old, which is considered to be a "younger" individual under the regulations.[96]   When dealing with an individual who claims they are disabled at a young age it is appropriate for the courts to "cautiously scrutinize the employment prospects of so young an individual before placing [her] on the disability rolls."[97]   The ALJ determined that Plaintiff was not disabled.  He found at step five that she could perform occupations that exist in significant numbers in the national economy.  These included an Addressor, Semi-Conductor Bonder, Small Parts Assembler and Medical Assembler.

---

[92] *See id* at 751.
[93] *See* Dixon v. Heckler, 811 F.2d 506, 510 (10th Cir. 1987).
[94] Henrie v. U.S. Dep't of Health & Human Servs., 13 F.3d 359, 360-61 (10th Cir. 1993); *see also* 20 C.F.R. § 404.944 (requiring the ALJ to "look[] fully into the issues").
[95] Mandrell v. Weinberger, 511 F.2d 1102, 1103 (10th Cir. 1975).
[96] *See* 20 C.F.R. § 404.1563 ("Younger person.  If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work.").
[97] McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

Ratcliffe first argues that the ALJ erred by failing to "fully and fairly develop the record by informing himself about the facts relevant to the decision."[98]   Specifically, the ALJ failed to adequately develop the record in relation to the nature of Ratcliffe's impairment.   This was in violation of the ALJ's duty, and therefore, this case must be remanded to allow for a full and fair evaluation.   In support of her arguments, Ratcliffe cites to *Andrade v. Secretary of Health and Human Servs.*[99]

In *Andrade*, the claimant suffered from depression that allegedly affected his ability to work.   The claimant was treated for depression on a weekly basis by his physician.   But, this treatment started only four months before the claimant's hearing with the ALJ.   The ALJ found that based on the record it was unclear whether the claimant's depression was expected to last for twelve months and went on to conclude that the claimant's depression was situational in nature and would cease once his legal problems went away.[100]

In reviewing the ALJ's decision the Tenth Circuit stated "When a record 'contains evidence of a mental impairment that allegedly prevented claimant from working the Secretary [is] required to follow the procedure for evaluating the potential mental impairment set forth in

---

[98] Mem. in Supp. p. 8.
[99] 985 F.2d 1045.
[100] *Id.* at 1048.

his regulations and to document the procedure accordingly."[101]  The court concluded that the

recorded contained enough evidence of a mental impairment that the ALJ failed to properly

consider it.[102]  And therefore, the case was remanded for further consideration of the claimant's

mental impairment.

In similar fashion the court in *Hawkins v. Chater*,[103] remanded for further consideration

of the claimant's disabling hypertension and chest pain.  The court stated that an "ALJ should

order a consultative exam when evidence in the record establishes the reasonable possibility of

the existence of a disability and the result of the consultative exam could reasonably be expected

to be of material assistance in resolving the issue of disability."[104]  As noted by the court, the

Commissioner has "broad latitude in ordering consultative examinations."[105]  But, when there is

a conflict in the medical evidence, or where the medical evidence is inconclusive a consultative

examination may be necessary.[106]

In rebuttal, the government argues that Plaintiff underwent three consultative

---

[101] *Id.* (quoting *Hill v. Sullivan*, 924 F.2d 972, 975 (10th Cir. 1991)) (alterations in original).
[102] *Id.*
[103] 113 F.3d 1162.
[104] *Id.* at 1169
[105] *Id.* at 1166.
[106] *Id.*

examinations that did not indicate Plaintiff was mentally retarded.[107]  Further, none of these

examinations found that her low average intellectual functioning significantly impacted

Ratcliffe's functioning in such a way as to preclude her from working.  Thus, "there was

substantial evidence of record to find that Plaintiff's low average intelligence did not preclude

the performance of a range of unskilled work, rather than a requirement that the ALJ obtain

another consultative examination."[108]

The court does not dispute that there is a lot of medical evidence in the record as outlined

*supra*.  But, the court finds that the ALJ failed to fully and properly develop the record as it

related to Plaintiff's IQ.  In opening statements before the ALJ, Ratcliffe's counsel stated that

Plaintiff has a "lower borderline IQ."[109]  She attended special education classes in high school

and was only able to complete those classes with "a great deal of help from her mom."[110]

Ratcliffe's counsel made a specific request for further evaluation of Ratcliffe's IQ, she stated

"record is not complete – that we need an IQ score on Ms. Ratcliffe to fully understand what her

condition is."[111]

The evidence concerning Plaintiff's IQ in the record is also somewhat contradictory.  Dr.

---

[107] Op. p. 16.
[108] *Id.* at 17.
[109] Tr. 33.
[110] *Id.*
[111] *Id.* at 34.

Arguello, who examined Ratcliffe in May 2002, stated that her memory was intact and she "seemed to have good intelligence."[112]  In October of that same year, Dr. Morse estimated that Plaintiff had low average general intellectual functioning.[113]  And, in April 2003, Dr. Kuentzel opined that Plaintiff had ADHD, major depression and a possible learning disorder.

During the hearing before the ALJ, Ratcliffe was asked a series of questions that tested her mental ability.  She was asked to read some sentences.  First she read, "The big brown dog had a red collar and a short tail."[114]  Ratcliffe thought reading that sentence was "pretty easy"[115] because it was somewhat like the books she read to Jarret, the two year old son of the friend with whom she was living.  Jarret's books were three or four pages with big words.  After reading the next sentence about consumer products, however, Ratcliffe could not answer the ALJ's questions about the meaning of the word consumer.[116]

Next, the ALJ asked Ratcliffe some questions about numbers.  She responded that she uses a calculator to add or subtract.[117]  When asked what comes after thousands Ratcliffe

---

[112] *Id.* at 167.
[113] *Id.* at 176.
[114] Tr. 50.
[115] *Id.*
[116] *Id.* at 50-51.
[117] *Id.* at 51.

responded billions.[118]  And Ratcliffe responded that 6,789,254.21 was a lot of money although

she could only identify the last part, 254.21.[119]  Finally, Ratcliffe could not use a needle to repair

a sock but could light a candle if the match was already lit.[120]

In opposition the Government states that "[w]hile Dr. Morse and Dr. Kuentzel both noted

Plaintiff appeared to have a low IQ . . . none of the examining physicians gave any indication

whatsoever that Plaintiff's IQ scores were so low as to place in the mentally retarded range of

intellectual functioning.  Nor did any of these medical sources state that Plaintiff's low

intellectual functioning would eliminate her ability to perform all work activity"[121]  While this is

true, the court finds that none of these exams specifically focused on Ratcliffe's IQ.  Ratcliffe's

counsel specifically requested that Ratcliffe's IQ be evaluated in a consultative exam.  The court

finds that when you add this request to the evidence in the record, including the contradiction in

past exams concerning Plaintiff's intelligence, that the ALJ was under a duty "to inform himself

about facts relevant to his decision.'"[122]  In his decision the ALJ states that the "claimant is of

low average intelligence and has some depression, however, there is no evidence of significant

---

[118] *Id.*
[119] *Id.* at 53.
[120] *Id.* at 53.
[121] Op p. 16.
[122] *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991) (quoting *Dixon v. Heckler*, 811 F.2d 506, 510 (10th Cir. 1987)).

cognitive or memory deficits or thought disorder that would preclude the claimant from understanding, remembering or carrying out simple instructions."[123]  Yet, the ALJ failed to even address Ratcliffe's counsel's request for an IQ evaluation in his decision.  Or address the contradictory evidence in the record surrounding Ratcliffe's IQ.  This is not a case where counsel failed to properly identify the issues requiring further development.[124]  Instead, the court finds it is the ALJ who failed to properly address issues that were identified before him during claimant's hearing and that were present based on a review of the record.

In light of the court's decision that the ALJ failed to properly address Ratcliffe's IQ, the court does not address Plaintiff's remaining arguments regarding the proper evaluation of the opinions of the examining physicians and the alleged improper rejection of Ratcliffe's testimony.

## RECOMMENDATION

Based on the foregoing the court recommends that Plaintiff's case be remanded back to the ALJ for further proceedings consistent with this decision, including further development of the record regarding Plaintiff's IQ.

---

[123] Tr. 21-22.
[124] *See Glass v. Shalala*, 43 F.3d 1392, 1394096 (10th Cir. 1994) (refusing to remand for further development of the record where the ALJ had examined the applicant's claims and where counsel who represented claimant failed to identify the additional information sought).

Copies of the foregoing report and recommendation are being mailed to all parties who are hereby notified of their right to object.  The parties must file any objection to the Report and Recommendation within ten days after receiving it.  Failure to object may constitute a waiver of objections upon subsequent review.


DATED this 5th day of February, 2006.

Brooke C. Wells
United States Magistrate Judge